Below is the Order of the Court.



_____
**Brian D. Lynch**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>SUSAN FAYE DONES,<br><br>Debtor. | Case No. 10-45608 |
| NXIVM CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SUSAN FAYE DONES,<br><br>Defendant. | Adversary No. 10-04338<br><br>**MEMORANDUM DECISION** |

| | |
|---|---|
| In re:<br><br>KIM MARIE WOOLHOUSE,<br><br>Debtor. | Case No. 10-45609 |
| NXIVM CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>KIM MARIE WOOLHOUSE,<br><br>Defendant. | Adversary No. 10-04339 |

Plaintiff NXIVM Corporation's consolidated adversary complaints against Defendants Susan Faye Dones and Kim Marie Woolhouse came on for trial on September 20 and 21, 2011. NXIVM sought (1) to deny Dones and Woolhouse their Chapter 7 discharges under various subsections of 11

U.S.C. § 727,[1] (2) turnover of its property, and (3) a permanent injunction against the Defendants. The Court heard testimony, admitted exhibits into evidence and took the matter under advisement. The Court has considered the arguments of counsel, and reviewed all documents and pleadings on file.

This Memorandum Decision sets forth the Court's Findings of Fact and Conclusions of Law for purposes of Rule 7052. The Court relies in part on evidence adduced at the preliminary injunction stage of this proceeding, in accordance with Rule 7065(a)(2). A separate Judgment and permanent injunction will be entered in accordance with Bankruptcy Rules 7058 and 7065. To the extent a Finding of Fact is a Conclusion of Law, or the converse, it is adopted as such.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334. The § 727 causes of action are core proceedings under 28 U.S.C. § 157(b)(2)(J). The Court has jurisdiction to enter the permanent injunction, a "related to" matter, because all parties have explicitly consented to this proceeding. 28 U.S.C. § 157(c)(2). Venue is proper under 28 U.S.C. §§ 1408, 1409.

## II. Background and Procedural History

NXIVM filed adversary proceeding 10-04338 against Susan Dones and adversary proceeding 10-04339 against Kim Woolhouse on October 18, 2010. The Dones complaint stated causes of action under §§ 523(a)(4), (6); 727(a)(2)(A); and 727(a)(4), (7). NXIVM also sought to require Dones to return NXIVM property including course materials and other proprietary information. The Woolhouse complaint stated causes of action under §§ 523(a)(6) and 727(a)(4), (7). NXIVM subsequently amended the Woolhouse complaint, seeking to obtain a preliminary and permanent injunction.

Shortly after filing the complaints, NXIVM filed an *ex parte* motion for an order to show cause for injunctive relief and temporary restraints against Dones. At that stage in the proceedings, NXIVM did not seek immediate turnover of its course materials and other information. Rather, it merely sought to prevent Dones from disseminating them. *See* Docket No. 6. On November 1, 2010 the Court

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101—1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001—9037.

entered an Order Granting Injunctive Relief, enjoining Dones from disseminating material subject to NXIVM's Confidentiality Agreement and from disposing of or transferring any of NXIVM's records or materials in her possession or control. *See* Docket No. 13. NXIVM amended the Dones complaint on November 9, 2010 to include a claim for permanent injunctive relief.

The Court held a preliminary injunction hearing on December 7, 2010 and entered a Preliminary Injunction against Dones on January 7, 2011. *See* Docket No. 57. The preliminary injunction enjoined Dones from disseminating a video tape and other NXIVM materials. The Court never entered an injunction or restraining order against Woolhouse.

NXIVM thereafter sought leave to file a second amended complaint against Defendants and to consolidate the two adversary proceedings. The motion was granted on March 18, 2011 and the adversary cases were consolidated under Case Number 10-04338. *See* Docket No. 87.

NXIVM filed its second amended complaints against Woolhouse and Dones on March 22 and 23, 2011, respectively (together, the "Complaint"). *See* Docket Nos. 88 and 90. The Complaint alleged the following causes of action against both Dones and Woolhouse: (1) a § 523(a)(6) claim for extortion, dissemination of confidential NXIVM material and damage to NXIVM's client base; (2) §§ 727(a)(4), (7) claims for false oaths, to wit, that Dones made false oaths about the client list, and that both Defendants falsely stated and/or omitted contingent claims against NXIVM and failed to schedule certain personal property in their schedules; (3) a complaint for injunctive relief to permanently enjoin Defendants from disseminating NXIVM's confidential and proprietary information; and (4) a civil conspiracy claim. The Complaint stated additional causes of action against Dones alone:  (5) a § 523(a)(4) claim for wrongful retention and use of NXIVM's client list; (6) a § 727(a)(2) claim for destruction and/or concealment of the client list; and (7) a claim for return of NXIVM's course materials, other information and the video tape. The Complaint sought interest, costs and attorneys' fees.

Discovery ensued. NXIVM filed various motions to compel discovery and for compliance with the Court's discovery orders. *See* Docket Nos. 94, 117, 161, and 184. Defendants did the same. *See*

Docket Nos. 104, 142, 153, 175, and 227. NXIVM also sought leave to conduct the depositions of nine third-party witnesses.[2] *See* Docket Nos. 103, 106—110, 118, 120 and 122. NXIVM assured the Court that all nine third-party deponents were crucial fact witnesses whose testimony was vital to NXIVM's case against Dones and Woolhouse. The Court permitted NXIVM to depose these third parties, but only with respect to certain topics. *See* Docket No. 140.[3] Finally, NXIVM sought and obtained a Protective Order because it was concerned about its documents and information being leaked to the general public. *See* Docket No. 147.

Barely five weeks before trial, and despite stating for months that it would pursue claims for damages, NXIVM filed a "Statement With Respect to Damages and Motion to Modify the Court's Orders Regarding Production of Financial Damages Categories of Documents." *See* Docket No. 210. This Statement and Motion was filed after the Court had ordered NXIVM to produce documents supporting its financial damages claims, which production had been the subject of numerous contentious discovery hearings. The Statement and Motion took the position that NXIVM "elects to waive a damages recovery for monetary relief" and requested that the Court modify its discovery orders so as not to require production of documents relating to monetary damages. At the August 31, 2011 hearing on the Statement and Motion, NXIVM dropped its § 523 claims against both Defendants, as well as its civil conspiracy claim. NXIVM was not required to produce any discovery with respect to damages. *See* Docket No. 246. The parties proceeded to trial on September 20 and 21, 2011. NXIVM's only remaining claims amounted to the § 727 claims, the claim for turnover of its property against Dones, and the claim for a permanent injunction against both Defendants.

---

[2] The Court required NXIVM to obtain leave to conduct third-party discovery because the Court became concerned that NXIVM was engaged in confusing and potentially abusive discovery practices. *See* Order Governing Third-Party Discovery by Plaintiff NXIVM Corporation, Docket No. 75.

[3] While NXIVM characterized these deponents as "crucial" fact witnesses, in fact none of the third-party deposition testimony was used at trial. Some of the deponents sought protective orders in this court because they had been subjected to numerous depositions by NXIVM in other proceedings with respect to the same topics at issue in this case. Defendants argued these depositions were conducted to harass and intimidate disaffected NXIVM members rather than for any legitimate discovery purpose. The Court has not read the third-party deposition transcripts and therefore draws no conclusion as to that issue at this time.

## III. Findings of Fact

### a. The parties

NXIVM, formerly known as Executive Success Programs, Inc., is a Delaware corporation with its principal place of business in Albany, New York. The conceptual founder and leader of NXIVM is Keith Raniere, who is referred to by NXIVM employees and followers as "Vanguard." Raniere does not hold any formal corporate position with the company.

NXIVM is a for-profit educational company that conducts training seminars at its "centers" throughout the world using proprietary course and training materials. NXIVM purports to specialize in training programs to advance human potential and ethics through personal and professional development. These courses are expensive, often costing many thousands of dollars. NXIVM videotapes many of its events and activities for educational purposes and to maintain consistency in its approach to teaching and instruction. NXIVM also videotapes many of Raniere's activities for "historical purposes" and because Raniere's words and thoughts allegedly contain patentable and valuable ideas that can be developed into NXIVM course materials.[4] NXIVM does not videotape Raniere on a 24/7 basis and many of his personal activities are not documented on video.

Dones and Woolhouse are individuals residing in Puyallup, Pierce County, Washington. Dones was formerly a high-ranking member of NXIVM. She has a master's degree in psychology and held at various times the titles of "Coach," "Procter," "Trainer" and "Center Head." Dones ran NXIVM's Tacoma Center for more than five years and supervised other NXIVM coaches and trainers. She built up the center with her own time and money. She and her staff taught NXIVM's course materials to hundreds of students. As a Center Head, Dones had special access to NXIVM materials, video DVDs, student and facilitator "notes" and a list of NXIVM students. Kim Woolhouse was a Procter and Trainer and assisted Dones in opening and operating the Tacoma Center. Dones and Woolhouse took educational courses from NXIVM, in addition to their leadership responsibilities. They never had any

---

[4] NXIVM has sought, thus far unsuccessfully, to have some of its training and instructional "modules" patented. *See* Exhibit D6.

written contracts with NXIVM for their work for the company and NXIVM takes the position that they are independent contractors rather than employees.

*b. NXIVM's confidentiality agreements*

NXIVM goes to considerable lengths to protect its proprietary and confidential information. Each student who receives NXIVM training is required to sign a Confidentiality Agreement and each person who participates in an "Intensive Program" is required to sign an Intensive Program Application. Dones and Woolhouse each signed at least one copy of both the Confidentiality Agreement and the Intensive Program Application (either with NXIVM or its predecessor, Executive Success Programs).[5]

The Confidentiality Agreement obliges Dones and Woolhouse to protect against the disclosure to third parties of NXIVM's "Proprietary and Confidential Information," which is a defined term:

> "Proprietary and Confidential Information" includes all proprietary and confidential information generally associated with TRAINING and communicated to RECIPIENT during the course of an INSTRUCTION, said proprietary and confidential information pertaining to, *inter alia*, inventions, Improvements, copyrighted material, trademark material, Trade Secret material, software, hardware, technical information, business information, financial information, marketing information, information specifically identified to RECIPIENT as proprietary or confidential, and any information which RECIPIENT should reasonably regard as proprietary or confidential, whether said proprietary or confidential information is communicated to RECIPIENT in the form of, *inter alia*, written materials, oral disclosures, verbal communications, visual communications, graphic materials, pictorial materials, data files, and software.

The term "Instruction" is defined:

> "Instruction" includes communication of information relating to TRAINING, to RECIPIENT by Discloser, said communications occurring orally, in written form, graphically, pictorially, visually, by sound, by data transmission, by conveyance of property, or demonstratively.

The term "Trade Secret" is defined:

---

[5] Dones disputed whether the Confidentiality Agreement admitted into evidence as Plaintiff's Exhibit P1 is a true and accurate copy of her Confidentiality Agreement. She claimed the document has not been authenticated and that NXIVM failed to establish the signature was hers. This objection notwithstanding, Dones admits that she signed several confidentiality agreements during her tenure at NXIVM and failed to (1) prove P1 was a forgery or (2) introduce into evidence any confidentiality agreements containing materially different terms. The Court finds that Exhibit PI is one of the Confidentiality Agreements signed by Dones.

1
2      "Trade Secret" material includes any information or materials that are valuable to CONTRACTOR, and not generally known by CONTRACTOR's competitors. Trade secrets are essential assets of CONTRACTOR acquired at great time and expense.

3   The Confidentiality Agreement contains an attorney's fees provision: "[i]n the event any legal action

4   arises relating to this Agreement, the prevailing party is entitled to recover all court costs, expenses

5   and reasonable attorney fees." It also contains provisions providing that (1) signatories are required to

6   return NXIVM's materials upon NXIVM's request and (2) NXIVM is entitled to injunctive relief for a

7   breach or threatened breach of the Confidentiality Agreement.

8          By signing NXIVM's Intensive Program Application, Dones and Woolhouse agreed (1) that

9   NXIVM's materials, methods and information are proprietary and confidential and cannot be copied,

10  duplicated or otherwise used; and (2) they would not compete with NXIVM in any way for a period of

11  five years after becoming inactive, including by any means which would potentially take monies or

12  actual or potential students away from NXIVM. The Intensive Program Application contains the

13  following language: "I UNDERSTAND THAT IF I CHOOSE TO LEAVE ESP, I MUST RETURN ALL

14  COURSE-RELATED MATERIALS AND THAT MAKING USE OF SUCH MATERIALS AFTER

15  LEAVING CONSTITUTES FRAUD." (capital letters in original).

16         Every official NXIVM event, Training or Instruction is customarily preceded by an oral

17  recitation of the NXIVM Mission Statement, which includes the following sentence: "Part of the

18  condition of being accepted into ESP is to keep all its information confidential." Each official NXIVM

19  Instruction or Training requires the participants to wear colored sashes denoting their rank and status

20  in the organization. The term "Instruction" refers to specific, formal NXIVM events at which students

21  are given training in NXIVM's materials and information and that the term does not refer to personal

22  or private meetings with NXIVM member or agents.

23         NXIVM argued for an expansive definition of the term "Training" in the Confidentiality

24  Agreement that would cover anything related to NXIVM's business. As discussed, *infra*, the Court

25  does not agree with NXIVM's interpretation of that term. The Court construes the term "Training" to

relate to information provided to students by NXIVM instructors and contractors during formal classes

and Instructions. In a similar vein, by signing the Intensive Program Application, a NXIVM student agrees to certain "Student Terms and Conditions," including an agreement that the "materials, methods and information" are confidential and proprietary assets of Executive Success Programs and NXIVM. As with the Confidentiality Agreement, the Court construes the phrase "materials, methods and information" relatively narrowly to encompass only that NXIVM information provided in the ordinary course of Instruction or Training. It does not cover the entire scope of information about NXIVM, its business or its agents and affiliates.

### c. Dones and Woolhouse leave NXIVM after an April 2009 meeting with Raniere

Dones and Woolhouse operated NXIVM's Tacoma Center up until April 2009. They both testified that NXIVM was very important to them, that they had spent a substantial amount of time and money to build up the Tacoma Center, and that they were fully dedicated to helping NXIVM spread its message and materials to more people. However, things began to sour in the spring of 2009. Dones and Woolhouse became aware of rumors regarding Raniere's behavior and grew increasingly disenchanted with the direction of the company as well as with NXIVM's management team, corporate strategy and its leaders' behavior.

In April 2009, Dones and Woolhouse traveled to Albany, New York for a meeting with Raniere and seven other high-ranking NXIVM personnel. The meeting took place over three days, from April 21 to April 23, 2009. The parties disagreed somewhat as to the content and purpose of the meeting. NXIVM argues the meeting discussed "structural and operational issues regarding NXIVM's business," such as "NXIVM's operations, leadership, litigations, arbitrations, alleged conflicts with NXIVM's major financial backers, and sensitive personnel matters including the personal relationships between NXIVM personnel." Dones testified that the meeting largely dealt with Raniere's "improper" sexual activities, financial investments and alleged conflicts of interest regarding NXIVM's involvement with the Bronfman sisters, major financial backers of the company. The meeting was not begun with NXIVM's Mission Statement, nor did the participants wear sashes. Dones attended only the first two days of the meeting; Woolhouse attended all three days.

Dones videotaped the meeting with her personal video camera and retains a copy of the video of the meeting in her possession (the "2009 Video"). She later made a short excerpt of the 2009 Video that she circulated to others, as discussed *infra*. The Court received a transcript of the meeting into evidence for *in camera* review.[6] NXIVM claims the 2009 Video is encompassed within the scope of the Confidentiality Agreements and the Intensive Program Applications signed by Dones and Woolhouse. Dones argues the 2009 Video is her personal property and that it is not protected by the written agreements because the meeting was in no way a formal NXIVM event, Training or Instruction.

At the preliminary injunction stage of this proceeding, NXIVM submitted a transcript of two excerpts from the meeting. The transcript contains the following statement, made at the beginning of the meeting on April 21, 2009:

> *Raniere says: "First of all, I want you all to agree that this be confidential and not go out to the public for a number of reasons."*
>
> *(They shake yes and shake their heads)*

While Dones and Woolhouse argue the 2009 Video is not subject to their written confidentiality agreements, they both testified at trial that they had, in fact, orally agreed not to disclose the meeting's contents. The Court finds that Dones and Woolhouse entered into an oral agreement with Raniere to keep the April 2009 meeting confidential.

Dones and Woolhouse were not satisfied with the outcome of the meeting and decided soon thereafter to resign from NXIVM and from running the Tacoma Center. After her resignation, Dones retained possession of certain NXIVM materials, including course and training materials, coach and student notes, flips charts and other media, student files and a copy of a client list. Complete copies of this material were turned over to NXIVM in discovery, but NXIVM seeks to force Dones to either (1) completely turn over the entirety of the material in her possession, or (2) destroy all material in her hands, including the 2009 Video, subject to verification by a court-appointed technical expert. Dones

---

[6] The topics discussed on the 2009 Video include: dissatisfaction among some NXIVM members with the company's financial backers and board members; NXIVM's litigation and problems with lawyers; disputes over board members and their conflicts of interest; and personal relationships involving high-ranking NXIVM members.

claims the video is her personal property and does not belong to NXIVM, but does not object to either returning or destroying the materials, including the 2009 Video if necessary. Defendants agreed with NXIVM's position that the course materials in their possession are covered by these agreements; they dispute only whether the 2009 Video is protected by the writings.

### d. Defendants' conduct after the April 2009 meeting

NXIVM's evidence at trial centered in large part on proving that, since the April 2009 meeting, Dones and Woolhouse have sought to extort money from the company, disseminated NXIVM's proprietary material or used it for their own purposes, and conspired with other parties to damage the company. The evidence shows otherwise. While it is clear that Dones has substantial animus toward NXIVM and her inability at trial to recall meetings or conversations was not credible, there is little evidence that Dones—much less Woolhouse—has actually taken any overt act to injure NXIVM. Furthermore, there is no evidence that either Defendant ever disclosed or used the training and instructional materials in violation of the Confidentiality Agreement or the Intensive Program Application.

### i. The alleged "extortion" email

On April 24, 2009, Dones and Woolhouse, along with seven other women who had attended the meeting, sent an email to Rainere and Nancy Salzman, President of NXIVM. The email stated that, based on the outcome of the meeting with Raniere,

> … we believe we can no longer continue a business relationship with ESP/NXIVM. Therefore, we are requesting the closure of outstanding value exchanges not met as well as the buyout for the Tacoma center for the [email signatories].
>
> We are requesting a response to this letter by 11:59 PM, Saturday, April 25, 2009. We are requesting a written, signed, notarized contract agreement to the below amounts by 11:59 PM, Sunday, April 26, 2009. We are requesting a Cashier's Check for the total amount due of $2,088,000 by Thursday, April 30, 2009.
>
> If these requests are not met we will move forward by contacting the Press.

NXIVM characterizes this email as an attempt to extort money from NXIVM and claims that after NXIVM refused to pay the money, Dones gave press interviews regarding NXIVM's internal workings.

However, apart from an August 2010 email to Conde Nast magazine, NXIVM provided no proof that Dones went to the press. As for the Conde Nast email, it merely encouraged the magazine to write an article about NXIVM without mentioning the April 2009 meeting with Raniere or disclosing any of NXIVM's instructional or training materials.

Dones and Woolhouse testified the email was sent because NIXVM owed them and the other women substantial sums of money for services rendered as NXIVM coaches, trainers and instructors. "Value exchange" is a NXIVM term of art: a person gives something and builds up a credit, such that he or she is owned some amount of "value" by the recipient (here, NXIVM). Dones and Woolhouse had spent substantial sums of time and money to build the Tacoma Center and, lacking written contracts and trusting NXIVM to make good on its debts, sought payment for these debts, *i.e.* their accumulated value exchange. The "threat" to go to the press was an attempt by the attendees to get NXIVM's attention, since Defendants believed NXIVM would otherwise simply blow them off. In any event, NXIVM refused to pay any money.

        *ii.*    *Defendants allegedly seek to disseminate NXIVM information*

One of NXIVM's central allegations is that Dones and Woolhouse and the other women who attended the meeting with Raniere undertook a course of intentional, willful and malicious public disclosure of the company's confidential and proprietary information. NXIVM points to several pieces of evidence in support of this contention: (1) a set of three emails dated October 18, 2009 from Dones to Barbara Bouchey, a formerly high-ranking NXIVM member and one of the nine women at the Raniere meeting; (2) a set of multiple emails dated January 14, 2010 from Dones to Bouchey purportedly attaching "sensitive NXIVM material;" and (3) Dones' disclosure of an excerpt from the 2009 Video to various individuals.

As to the October 18, 2009 and January 14, 2010 emails, NXIVM alleged they contained sales reports, NXIVM financial information, a business plan to expand the Tacoma Center, results from a course given in Ireland, and other sensitive NXIVM confidential information protected by the Confidentiality Agreement and Intensive Program Application. However, the evidence is ambiguous.

While the emails purport to attach documents with titles like "Misc NXIVM Info," "Sale-Marketing Info Part A," Tacoma Center Percentage Earnings 12-08," and the like, NXIVM chose not to introduce the attachments themselves into evidence even though it had obtained them in discovery. Dones testified that the attachments were her own work product and notes, generated during her tenure as head of the Tacoma Center, and are not NXIVM's proprietary material. The Court is unable to determine whether the material might be proprietary because it was not provided with the email attachments.

In fact, based on Dones' uncontroverted testimony and the email attachments' titles, and in the absence of other evidence, the Court cannot but find that the emails and attachments do not come within the definition of "Proprietary and Confidential Information" or materials protected in the Intensive Program Application. They are not "associated with Training," nor were they communicated to a NXIVM student "during the course of an Instruction." In addition, Dones sent the information only to Ms. Bouchey, a formerly high-ranking NXIVM member who attended the three-day meeting with Raniere. Taken as a whole, Exhibits P10 and P12 are not persuasive evidence (1) that Dones exposed NXIVM's proprietary materials, or (2) that the emails and their attachments are in fact protected under the Confidentiality Agreement or the Intensive Program Application. Furthermore, there is no evidence at all that Woolhouse disseminated any of NXIVM's proprietary information

On the other hand, the evidence was clear that Dones circulated a link to an excerpt from the 2009 Video despite orally agreeing to keep the 2009 meeting with Raniere confidential. Dones sent an email to multiple individuals on October 21, 2010, which included the link to the video excerpt and stated: "[t]his video is intended for you only and I trust you will keep it's [sic] location safe. Here is the link." She claimed to have been motivated by a fear for her own personal safety, and by a concern that she would be an "accessory after the fact" with respect to NXIVM's alleged crimes. She labeled herself as a "whistleblower" dedicated to exposing the truth about NXIVM. The Court does not find Dones' motivation and justifications credible under the circumstances. The Court also finds there is a risk that Dones would further circulate the 2009 Video if she is not enjoined, her oral agreement

notwithstanding. However, there is no evidence that Woolhouse took any action to disseminate the 2009 Video or any portion thereof.

### iii. Defendants' alleged use of NXIVM materials to compete with NXIVM

NXIVM argued that Defendants sought to use, or in fact have used, its material to compete with the company and lure customers and potential customers away from NXIVM. NXIVM relies on two emails in support of this allegation. The first email was sent from Dones to Bouchey on April 16, 2009, just before the meeting with Raniere. It notes that Dones was pessimistic about the prospects for the meeting, that "everyone is saying we are all going to leave," and went on to pose the following questions:

> … with the confidentiality / no compete document we signed, how does that effect [sic] us going out into the world with other workshops?

> … do you think there is any way they would let us repackage Level 1, rename it, no connection to Keith/Nancy as the cult thing is killing business. No sashes / no mission statement we can set it up any way we want?

> What if we use the NLP part of the training and repackage it and leave out the EM tech…is that using their stuff?

Second, NXIVM pointed to a May 22, 2009 email from Dones to various parties in which she states: "[w]e can go over all the modules in Ethos (not by retaking them but bring your notes if you want) and dig into what was profound for each of us about each of the modules."

NXIVM argues these emails are a clear indication that Dones and Woolhouse intended to repackage NXIVM's material for their own seminars and demonstrates the potential for irreparable injury justifying the need for a permanent injunction. However, Dones and Woolhouse testified they have never repackaged or used NXIVM's material for any reason after resigning, and there is no evidence to the contrary. Dones pointed out that the April 16, 2009 email contains several questions and proposals in which she asked whether NXIVM might be open to allowing the use of its materials, but that she never actually followed through with this plan. In fact, she asked Raniere after the 2009 Meeting whether he would permit her to use NXIVM's materials and was firmly rebuffed. Furthermore, with respect to the May 22, 2009 email, the meeting to go over the Ethos modules never occurred.

1  Dones and Woolhouse both provided convincing testimony not only that they have not used the
2  materials in any way, but that they have no future intention to use NXIVM's materials because, in
3  Dones' words, it would be dishonest and akin to stealing.

4      Aside from these two emails from Dones, NXIVM introduced no evidence that Defendants
5  intended to use, or in fact actually used, its materials for their own benefit. There is also no evidence
6  that Defendants used the NXIVM materials in their possession to lure away customers and potential
7  customers in violation of their non-compete agreements.

8                  *iv.    Dones' alleged involvement with NXIVM adversaries*

9      NXIVM presented evidence of emails and conference calls between Defendants and other
10  parties adverse to NXIVM, including some of the nine women who attended the meeting with Raniere
11  as well as attorneys involved in litigation with the company. NXIVM contends this correspondence was
12  part of a conspiracy to damage the company and drive away students.

13      First, NXIMV points to telephone calls between Defendants and other disgruntled former
14  NXIVM personnel or adverse parties "to find devious means to injure NXIVM." NXIVM's main evidence
15  of these conference calls is Exhibit P19, containing an email from a certain Joseph O'Hara to Dones
16  referencing a conference call, and Dones' response that "I will text everyone the conf [sic] line and will
17  work to get things move to another site but not until later today." Dones testified that while she could
18  not clearly recall the substance of these conference calls, they were in the nature of a self-help group,
19  rather than for the purpose of devising ways to harm NXIVM.

20      Second, NXIVM presented evidence of an email discussion between Dones and others
21  regarding a child of a NXIVM employee. This correspondence detailed an effort to obtain pictures of
22  the child and file claims, such as a complaint or report, with New York's Child Protective Services.
23  NXIVM relies on exhibits P20, P22, P23 and P27 to support this allegation. Exhibit P22 is a September
24  7, 2010 email from O'Hara stating "[b]ecause I'm not friends with Edgar, I can't get to the photos of
25  G____," and a response email from Dones stating: "Here are the pics – I noticed Edgar took down his
   pics from FB so no one can get to them. I love that we are a bug up their ass that they have to worry

1 about such things." Exhibit P20 is an August 12, 2010 email from Dones to O'Hara stating: "I hope she

2 gets her ass kicked. Will they do anything you think?" Exhibit P23 is a September 8, 2010 email from

3 O'Hara to Dones requesting changes to a "follow-up letter to the AG," and Dones' response email

4 stating: "I added some in pink high light." Finally, Exhibit P27 contains an email from O'Hara giving

5 Dones the "name and telephone number of the Child Protective Services (CPS) investigator who has

6 been assigned to G_____'s case."

7      The problem with this allegation is that it bears no relevance whatsoever to NXIVM's § 727 and

8 permanent injunction claims. Aside from demonstrating animus toward NXIVM, these emails do not

9 relate to whether Defendants lied on their bankruptcy schedules or seek to use or disclose the 2009

10 Video or NXIVM's confidential course information. The second problem for NXIVM is that Dones

11 testified that she never personally followed through with any alleged plot to report the child's mother to

12 Child Protective Services, nor did NXIVM produce evidence that she did so, and there is no evidence

13 that Woolhouse had anything to do with this alleged scheme to harm NXIVM and/or one of its

14 members. In addition, NXIVM failed to lay a foundation for how Dones' statement that "I hope she

15 gets her ass kicked" relates to the child's mother. Indeed, that email was sent on August 12, 2010

16 while the other emails were all sent weeks later.

17      Third, NXIVM claimed "Dones conspired with her friends to file false claims with health

18 authorities in New York about food poisoning at a 'Family Values' event hosted by NXIVM." It points to

19 a October 9, 2010 email from Dones to two individuals in which Dones references an upcoming Family

20 Values event and, after asking whether the recipients have "pull with the health department," notes

21 that NXIVM lacks a proper kitchen to serve food at their events—before concluding with the phrase

22 "[w]ould be good to rattle their cages." While this email demonstrates Dones' animus toward NXIVM,

23 there is no evidence that she ever followed through with this idea.

24      *e. Defendants allegedly make false oaths and fail to omit property in their schedules*

25      Dones and Woolhouse filed their Chapter 7 petitions on July 9, 2010. Woolhouse listed on her

Schedule B at Question 21 a "Contingent Claim against – NXIVM (Executive Success Programs) for

Business Related Issues," valued as "unknown." NXIVM asserts this claim is non-existent and thus a false oath for purposes of § 727(a)(4)(A) as well as a false claim, made knowingly and fraudulently, for purposes of § 727(a)(4)(B). In contrast to Woolhouse, Dones did not list any contingent claim against NXIVM in her Schedule B even though, before bankruptcy, she had claimed to be entitled to $259,000 of the $2,088,000 sought in the April 24, 2009 email to Rainiere and Salzman. NXIVM asserts Dones' alleged failure to list this contingent claim forms the basis for denial of discharge under § 727(a)(4) as well as § 727(a)(7).

NXIVM further alleged that Dones and Woolhouse were named beneficiaries in the last will and testament of a deceased third party, and that their failure to schedule such personal property is a false oath or account under § 727(a)(4)(A). NXIVM also claimed that Woolhouse concealed or transferred property of an insider—*i.e.*, Dones—with the intent to hinder, delay or defraud NXIVM, which is a sufficient basis to deny discharge under § 727(a)(7).

Finally, Dones listed on her Schedule B at Question 24 a "NXIVM Student List," to which she ascribed a value of "$0.00." NXIVM claims this is sufficient to deny Dones a discharge under § 727(a)(2) because (1) Dones has destroyed the value of the client list with the intent to hinder, delay or defraud NXIVM or (2) if the list is valuable, scheduling it with a value of zero is an attempt to conceal or transfer the asset away from NXIVM. NXIVM also claims Dones' scheduling of the NXIVM Student List contains two false oaths for purposes of § 727(a)(4): (1) that the client list is worth zero, and (2) that the client list is Dones' personal property.

At trial, NXIVM presented no evidence apart from Defendants' bankruptcy petitions and some testimony from the defendants to support these causes of action. NXIVM failed to establish how Woolhouse's claim against NXIVM is "non-existent." Dones testified that she did not schedule a contingent claim against NXIVM because her prior counsel had advised her that it would cost more money than it was worth to recover the unpaid "value exchange." Defendants' bankruptcy attorney testified that when dealing with a disputed or contingent claim, he generally advises his clients to disclose the claim. Here, NXIVM failed to show how the evidence presented supports its § 727(a)(7)

claims, or to explain how Dones committed any objectionable § 727 actions in Woolhouse's case (or vice-versa). With respect to the personal property from the will, Defendants testified that neither was in fact a named beneficiary in the will, and that there was therefore nothing to list in their schedules. They introduced a copy of the will into evidence to substantiate their defense.

As to the client list, NXIVM produced no evidence that Dones destroyed the client list or its value. Dones retains a copy of the list and, to the extent NXIVM's claims are based on its more general allegations that Defendants drove down student enrollment, NXIVM failed to produce any evidence of damages to underpin this claim. Furthermore, Dones credibly testified that she was caught between a rock and a hard place with the list. There are no contractual documents or other material that sets forth whether the list and its students "belong" to NXIVM or Dones. After all, Dones was responsible for recruiting new students and a percentage of her earnings was based on how many students she brought into the organization. She was unsure whether to label the list as "NXIVM Student List"—in which case NXIVM would claim that Dones falsely scheduled the list as her own property—or to omit it altogether from her schedules, in which case NXIVM would claim she hid assets from her creditors. After consulting with her bankruptcy attorney, Dones determined to schedule the list, but to ascribe to it a value of zero because it had no value to her personally. The Court finds this explanation credible and an appropriate solution under the circumstances.

   *f.   Dones has long sought to return NXIVM's materials to the company*

The Complaint seeks to compel Dones to return NXIVM's course materials and other confidential and proprietary information, as contemplated in the Confidentiality Agreement, despite the fact that she has long sought, unsuccessfully, to return these materials. The documents, pleadings and affidavits in this adversary proceeding are replete with instances in which Dones and Woolhouse documented their desire and efforts to return NXIVM's materials, subject only to a fair process by which she could maintain a record of what they had returned (in order to preclude NXIVM from claiming they had failed to return certain material). *See* Docket No. 31, ¶ 52—63; Docket No. 46, P. 16, ¶ 9; Docket No. 51, ¶ 13; Docket No. 55, Pp. 2—5; Docket No. 77, P. 11. Dones also made at least

17

two offers on the record to return NXIVM's materials, including at the December 7, 2010 preliminary injunction hearing and at a February 23, 2011 pretrial conference. Dones even filed a separate motion documenting her travails in returning NXIVM's materials and requesting the Court to adjudicate a process whereby she could turn over the materials. *See* Docket No. 53. Ultimately, as authorized by the Preliminary Injunction, Defendants were able to provide their former bankruptcy attorney with the hard copies of NXIVM's materials, which were turned over to NXIVM's attorneys in Seattle early in this case.

Based on the above, the Court finds that, from the beginning of this adversary case, Dones made repeated, sincere and unsuccessful efforts to return NXIVM's materials but was stymied by NXIVM's refusal to accept the materials in a reasonable manner. The Court is left with the impression that NXIVM was less interested in getting the materials back than in using the turnover of the materials to gain an advantage regarding its other claims.

One other point bears mentioning: at some point in the course of discovery, Defendants came across an old computer in their attic that contained various NXIVM materials. Dones and Woolhouse did not know of the computer's existence or that it contained materials subject to turnover. Upon discovering the computer, they promptly copied its contents onto a DVD and turned it over to NXIVM as a supplement to their discovery production. They did not destroy the materials—*i.e.* wipe the hard drive—because they were concerned about being accused of spoliation of evidence, a legitimate concern given NXIVM's approach to litigation in this case. They testified as to their willingness to destroy the evidence upon proper Court order. NXIVM argued at trial that this sequence of events proves Defendants have refused to comply with (1) the Court's discovery orders and (2) their obligation under the Confidentiality Agreement to return NXIVM's materials upon requests. The Court does not view it that way. In the Court's mind, Defendants acted properly in turning over copies of the material while preserving the evidence until trial.

**IV. Conclusions of Law**

The following constitutes the Court's conclusions of law.

1

2

      *a. The 2009 Video does not come within the scope of NXIVM's written Confidentiality Agreement or the Intensive Program Application; Dones and Woolhouse entered into an oral confidentiality agreement at the April 2009 meeting with respect to the 2009 Video.*

3     NXIVM argues the 2009 Video is encompassed within the scope of Defendants' Confidentiality

4 Agreements and Intensive Program Applications. NXIVM is wrong. The Confidentiality Agreement

5 provides that "Proprietary and Confidential Information includes all proprietary and confidential

6 information generally associated with TRAINING and communicated to RECIPIENT during the course

7 of an INSTRUCTION." Dones testified that no participant at the 2009 Meeting wore a sash, nor was

8 the NXIVM Mission Statement read at the beginning of the meeting. The Court has reviewed the

9 transcript of the meeting and is convinced that the meeting was in no way a NXIVM "Training" or

10 "Instruction." Rather, the meeting dealt with the nine women's objections to the manner in which the

11 company was run and issues related thereto. Although the participants invoke NXIVM concepts and

12 specialized lingo to communicate with each other, there is no attempt to teach or instruct anybody in

13 NXIVM's confidential technology, methods, or materials. For the same reasons, the 2009 Video does

14 not come within the terms of the Intensive Program Application.

15     However, the Court concludes that Dones and Woolhouse entered into an oral confidentiality

16 agreement with Raniere to keep the meeting from public disclosure. Defendants freely admitted their

17 oral agreements to keep the meeting confidential, which admissions render the agreement binding and

18 enforceable under New York law, the statue of frauds prohibition against contracts of indefinite

19 duration notwithstanding. *See, e.g., Thomas v. Thomas*, 896 N.Y.S.2d 30, 32 (N.Y.A.D. 2010) ("[T]he

20 statute of frauds is not a bar to plaintiffs' claim. That is because Janet Thomas admitted in her affidavit

21 that she agreed to the arrangement proposed by plaintiffs."). The Court thus concludes as a matter of

22 law that the 2009 Video is protected by the terms of Dones' and Woolhouse's oral agreement with

23 Keith Raniere, and no other agreement or writing.

24     *b. NXIVM is entitled to a permanent injunction against Dones, but not Woolhouse, to prevent her from disseminating the 2009 Video.*

25

The criteria for granting a permanent injunction are "the likelihood of substantial and irreparable injury and the inadequacy of remedies at law." *LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir. 1985) (citation omitted). The Court concludes that there is a likelihood of substantial and irreparable injury to NXIVM if Dones is not permanently enjoined from disseminating the 2009 Video and that NXIVM lacks adequate remedies at law. The Court further concludes that NXIVM is not entitled to a permanent injunction against Woolhouse with respect to the 2009 Video.

As an initial matter, under Bankruptcy Rule 7065(a)(2), "evidence that is received on the motion [for a preliminary injunction] and that would be admissible at trial becomes part of the trial record and need not be repeated at trial." *Id.* The evidence adduced at the preliminary injunction hearing, when bolstered by the evidence at trial, proves NXIVM's entitlement to a permanent injunction against Dones.

The Court is convinced that Dones might disclose the 2009 Video of the meeting with Raniere to third parties if she is not enjoined from disseminating the Video. The Court has reviewed the transcript of the meeting *in camera* and, while the meeting does not come within the scope of NXIVM's written Confidentiality Agreement or Intensive Program Application, as discussed *supra*, the video contains embarrassing and potentially damaging material for NXIVM. Dones has already shown a willingness to disclose an excerpt of the 2009 Video despite her oral confidentiality agreement with Raniere and the Court is convinced there is a risk Dones would release the video. Her testimony at trial was less than candid about her memory of conversations with others after she resigned from NXIVM. While the 2009 Video is Dones' property because it was shot on her own camera and NXIVM has failed to demonstrate ownership thereof, she should be precluded from disseminating it to third parties.[7]

Furthermore, NXIVM lacks adequate remedies at law because monetary damages will not compensate NXIVM if Dones were to disseminate the video. Since the 2009 Video is not subject to the

---

[7] This, of course, means that NXIVM is not entitled to turnover of the 2009 Video. To the extent the Complaint seeks physical turnover of the 2009 Video, such relief is DENIED.

Confidentiality Agreement (which provides for attorneys' fees) or the Intensive Program Application, NXIVM's only recourse would be to bring an action to enforce the terms of a vague oral confidentiality agreement. In contract, Dones will not be harmed by an injunction forbidding her from disseminating the 2009 Video and the public interest is advanced by entry of a permanent injunction that upholds a valid confidentiality agreement.

Accordingly, the Court GRANTS NXIVM's request for a permanent injunction against Susan Faye Dones with respect to the 2009 Video. A separate judgment setting forth the scope of the injunction shall be entered in accordance with Federal Rule of Civil Procedure 58(a), as incorporated by Bankruptcy Rule 7058.

On the other hand, NXIVM has failed to show why the Court should enter a permanent injunction against Woolhouse with respect to the 2009 Video. She does not have the video in her possession. As opposed to Dones, she has never leaked the video or a portion thereof to anyone. There is no evidence that Woolhouse violated her oral confidentiality agreement and no evidence to suggest that NXIVM would be injured if Woolhouse is not enjoined. Thus, the Court DENIES NXIVM's request for a permanent injunction against Kim Marie Woolhouse with respect to the 2009 Video. This is not intended to suggest that Woolhouse is not still bound by her oral confidentiality agreement.

   *c. NXIVM is not entitled to a permanent injunction against Dones or Woolhouse with respect to the course materials in their possession.*

The Court concludes there is little danger that either Dones or Woolhouse will cause irreparable injury to NXIVM by disseminating NXIVM's course materials and other confidential and proprietary information. NXIVM provided little evidence at trial that either Defendant has in fact shared NXIVM's confidential and proprietary information with any third party (aside from the 2009 Video). The evidence shows precisely the opposite: Dones and Woolhouse have maintained, safeguarded and protected the NXIVM instructional and training materials in their possession and sought on multiple occasions to return the material to NXIVM. They have both acknowledged multiple times that they regard the materials as subject to the Confidentiality Agreement and Intensive Program Application,

and avowed not to share it with anyone or use it for their own purposes. The Court concludes there is no risk of irreparable injury to NXIVM if Defendants are not enjoined with respect to the course materials. In any event, NXIVM has adequate remedies at law. The materials are clearly subject to the Confidentiality Agreement and Intensive Program Application and NXIVM could sue Defendants on those contracts and, presumably, recover attorneys' fees, if in the future either Dones or Woolhouse seeks to make use of the materials in the future. But they have not done so thus far.

Thus, the Court DENIES NXIVM's request for a permanent injunction against Defendants with respect to the course materials and other NXIVM confidential and proprietary information in their possession.

*d. Turnover of property*

One of NXIVM's claims against Defendants is for turnover of this property. NXIVM repeated throughout this adversary proceeding that it desired the return or destruction of its materials and Defendants stated their willingness to cooperate on this front. At trial, NXIVM offered to pay for a court-appointed computer technician to ensure that no proprietary material remained on the Defendants' computer referenced at trial. The Court finds this to be a reasonable solution to the extent NXIVM regards the presence of the materials on the computer to be a problem. Therefore, should NXIVM desire to pursue this course of action, it shall apply to the Court to employ a technician pursuant to 11 U.S.C. § 327 and bear the costs of employing such a professional. The scope of any professional's duties and responsibilities shall be set forth by further order of this Court. The expert will not be allowed to retain or disclose any information contained on the computer other than NXIVM's materials (*i.e.* Defendants' personal information and data).

*e. Dones and Woolhouse are entitled to a Chapter 7 discharge.*

NXIVM has failed to make out a case for denial of discharge against either Dones or Woolhouse.

*i.    § 727(a)(2) claim against Dones*

Section 727(a)(2) provides for denial of discharge based on a debtor's fraudulent transfer or concealment of assets. It requires that the act complained of be done with the actual specific intent to hinder, delay or defraud creditors. *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417 (5th Cir. 1990). The court may look to the facts and circumstances to establish actual intent. *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985). Here, NXIVM alleges Dones destroyed the value of the client list. In the alternative, NXIVM argues that her scheduling of the list with a value of zero constitutes an attempt to conceal or transfer the asset away from NXIVM. There is no evidence that Dones destroyed the value of the client list. NXIVM argued that Dones damaged the company by driving away students, but failed to provide evidence to support this allegation. Furthermore, it is entirely unclear how Dones can be guilty of hiding a valuable asset, even if she assigned to it a value of zero, given the fact that she *scheduled it in her bankruptcy petition*. NXIVM has to prove there was an actual transfer of valuable property belonging to Dones that reduced the assets available to creditors, done with actual fraudulent intent. Listing the client list with zero value does not in fact reduce the assets available to creditors, nor does it constitute a "transfer" of property.

NXIVM's § 727(a)(2) claim against Dones is DISMISSED WITH PREJUDICE.

### ii. § 727(a)(4) claims against Dones and Woolhouse

NXIVM makes the following § 727(a)(4)(A) claims against Dones: she failed to schedule a contingent claim against NXIVM for unpaid commissions; she failed to schedule personal property to which she was entitled as the beneficiary of a will; she listed the NXIVM Student List as being worth nothing; and she falsely stated that NXIVM Student List belonged to her. As to Woolhouse, NXIVM makes the following claims: her scheduling of a non-existent contingent claim against NXIVM is a false oath under § 727(a)(4)(A) and a false claim under § 727(a)(4)(B); and she failed to schedule personal property to which she was entitled as a will beneficiary. None of these § 727(a)(4) claims have any merit whatsoever.

A debtor may be denied a discharge under § 727(a)(4)(A) if she "knowingly and fraudulently, in or connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A). A "false oath" is

commonly found where a debtor knowingly or fraudulently omits assets from her schedules. The false oath must relate to a material matter. *Coccia v. Fischer (In re Fischer)*, 4 B.R. 517, 518 (Bankr. S.D. Fla. 1980) ("[a] bankruptcy discharge may be denied under § 727(a)(4)(a) only if the false oath related to a … matter … material to the condition of the estate or the debtor's entitlement to a discharge"). If items were omitted upon the advice of counsel after disclosure of the relevant facts, the declaration will not be deemed willfully false. *See, e.g.*, *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) ("explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud"). A debtor may be denied a discharge under § 727(a)(4)(B) if the debtor knowingly and fraudulently presents or uses a false claim in or in connection with the debtor's own case. The plaintiff has the burden of proof on the elements necessary to sustain a denial of discharge. Fed. R. Bankr. P. 4005.

Here, NXIVM has failed to carry its burden of proof on any of its § 727(a)(4) claims. Dones testified that she did not schedule a contingent claim against NXIVM because she had, on the advice of prior counsel, abandoned that claim as worthless because it would cost more to collect on the claim that she could feasibly recover. The Court concludes she was entitled to rely on the advice of counsel and that her failure to schedule an unrecoverable claim—for which she lacked a written contract—is not material on these facts and does not constitute a false oath. NXIVM similarly failed to prove how Woolhouse's scheduled claim was "false" for purposes of § 727(a)(4)(B) other than disputing whether it owed her the money. It is also unclear how Woolhouse's scheduling of a contingent claim can be considered a "false oath." It certainly is not material in any sense of the word, given that it put the Chapter 7 Trustee and other creditors on notice of a potential estate asset, as opposed to hiding an asset from creditors.

As to Dones' scheduling of the NXIVM Student List, NXIVM also failed to carry its burden of proof. NXIVM claims the first false oath is that the list is worth nothing. However, in establishing materiality, the question is not merely the value of the asset, but whether the understatement precluded the trustee's or creditors' ability to discover other assets or fully investigate the debtor's

1  prebankruptcy dealings and financial condition. *See, e.g.*, *In re Beaubouef*, 966 F.2d 174 (5th Cir.

2  1992) (failure to list interest in corporation material despite debtor ascribing a zero value to the

3  interest). Here, NXIVM has not proven that the list's value is not zero; Dones testified that it was worth

4  nothing to her or anyone else, and NXIVM failed to show how this purported false statement had any

5  effect on the case whatsoever. Similarly, the dispute over ownership of the list is not grounds to deny

6  Dones a discharge. There was no evidence as to who actually owned the list and Dones' bankruptcy

7  attorney, with full knowledge of the facts, advised her to schedule this list and give it a zero value. This

8  reliance on advice of counsel rebuts any presumption of a knowing and fraudulent false oath. *Mascolo*,

9  505 F.2d at 277.

10  Finally, Dones and Woolhouse both testified that they were not named beneficiaries in the will

11  and NXIVM provided no proof to the contrary. Their failure to schedule non-existent personal property

12  is not actionable under § 727(a)(4)(A). A debtor need not list that which a debtor does not own.

13  NXIVM's § 727(a)(4) claims against Defendants are DISMISSED WITH PREJUDICE.

14  *iii.    § 727(a)(7) claims against Dones and Woolhouse*

15  Section 727(a)(7) denies a discharge to a debtor who within one year before the date of the

16  filing of the petition or during the debtor's own case commits any of the acts specified in § 727(a)(2),

17  (3), (4), (5) or (6) in connection with another case involving an insider. "Insider" is defined in a non-

18  exhaustive list in § 101(31) and generally refers to any person who has a sufficiently close relationship

19  with the debtor sufficient to "command preferential treatment by the debtor." *In re Friedman*, 126 B.R.

20  63, 70 (B.A.P. 9th Cir. 1991). Here, NXIVM has failed to establish that Dones or Woolhouse are

21  insiders of each other. Second, even assuming Defendants are in fact insiders of each other, NXIVM

22  failed to show that either Defendant violated § 727(a)(2), (3), (4), (5) or (6) in the other's bankruptcy

23  case within a year before the date of the petition.

24  NXIVM's § 727(a)(7) claims against Defendants are DISMISSED WITH PREJUDICE.

25  *f.  NXIVM is not entitled to attorneys' fees or costs*

The Complaint seeks attorneys' fees and costs against Dones and Woolhouse. NXIVM relies on two theories to recover fees and costs: (1) the attorneys' fees provision in the Confidentiality Agreements; and (2) a New York exception to the prevailing American Rule for fees and costs in circumstances in which parties act "with disinterested malevolence [and have] … intentionally sought to inflict economic injury on [another party] by forcing [him or her] to engage legal counsel." *Palermo v. Taccone*, 913 N.Y.S.2d 859, 862 (N.Y.A.D. 2010) (citation and punctuation omitted). Neither basis is sufficient grounds for NXIVM to recover its fees and costs.

> ### i.    The Confidentiality Agreement

NXIVM's Confidentiality Agreement provides: "[i]n the event any legal action arises relating to this Agreement, the prevailing party is entitled to recover all court costs, expenses and reasonable attorney fees." A plaintiff may be considered a "prevailing party" if it "succeed[s] on any significant issue in litigation which achieves some of the benefit the [party] sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (citation omitted). The Court has discretion to determine what attorneys' fees are reasonable. *Id.*

NXIVM is not the prevailing party under the Confidentiality Agreement with respect to the 2009 Video. First, as noted above, the 2009 Video is not subject to the Confidentiality Agreement. NXIVM has prevailed on its claim for a permanent injunction against Dones as to the 2009 Video only by virtue of the oral confidentiality agreement, as to which there was no attorneys' fees provision.

Arguably, NXIVM has prevailed against Dones on its turnover action under the Confidentiality Agreement with respect to NXIVM's course materials.[8] However, even assuming that NXIVM could be said to have succeeded on a "significant issue" under the *Hensley* test by virtue of its turnover action, the Court concludes that no award of attorneys' fees and costs would be reasonable because (1) NXIVM refused to cooperate with Dones in returning its material and (2) Dones in fact returned

---

[8] NXIVM's complaint against Woolhouse does not include a claim for turnover of its property and NXIVM could not therefore recover fees against Woolhouse for a turnover action under the Confidentiality Agreement.

NXIVM's materials early in the case.[9] Dones made numerous attempts over many months to return NXIVM's materials, but NXIVM threw up road blocks and deliberately thwarted her attempts to return the materials in a fair and reasonable manner. In other words, NXIVM could have obtained possession of its materials from the very beginning of this adversary proceeding but instead chose to forge ahead with an expensive lawsuit. On the facts and circumstances of this case, no attorneys' fees and costs would be reasonable and the Court declines to award NXIVM fees against Dones under the Confidentiality Agreement based on the turnover action.

*ii.    The New York common law exception to the American Rule*

The Court regards NXIVM's "intentional infliction of economic injury" theory as akin to a claim for prima facie tort. New York is the only state to clearly adopt the cause of action for a prima facie tort. *City of Angoon v. Hodel*, 836 F.2d 1245, 1248 (9th Cir. 1988) (noting that while Missouri and Kansas might recognize the theory, Alaska does not). NXIVM is not entitled to recover under this theory for three reasons: (1) there is no basis to apply New York law and Washington law does not recognize this cause of action on these facts; (2) there is no evidence that Defendants committed a prima facie tort against NXIVM; and (3) NXIVM did not plead this cause of action in the Complaint.

NXIVM has provided no basis for a bankruptcy court in the Western District of Washington to entertain a cause of action under New York law for prima facie tort. A federal bankruptcy court must follow the conflict of laws rules prevailing in the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). In resolving conflicts of laws questions regarding torts, Washington courts follow the Restatement (Second) of Conflict of Laws "most significant relationship" test. *Singh v. Edwards Lifesciences Corp.*, 210 P.3d 337, 340 (Wash. Ct. App. 2009). This test requires the court to decide which law applies by determining which jurisdiction has the most significant relationship to a given issue. *Id.* The Court must evaluate the contacts both quantitatively and qualitatively, taking into

---

[9] As noted above, Dones succeeded in turning over the NXIVM materials in her possession to her bankruptcy attorney, who then delivered them to NXIVM's Seattle attorneys. She also gave NXIVM a DVD copy of the subsequently discovered materials on the old computer in her attic.

27

account the place where the injury occurred, the place where the conduct causing the injury occurred, the parties' domicile and place of business and the place where the relationship between the parties is centered. *Id.* (citing *Johnson v. Spider Staging Corp.*, 555 P.2d 997, 1000 (Wash. 1976)).

Here, while NXIVM has its principal place of business in New York, the Defendants are domiciled in Washington. NXIVM complains that it was injured in the Tacoma region, the conduct allegedly leading to NXIVM's injury occurred in Washington and the parties' relationship is centered in Washington. Accordingly, the Court concludes that it must apply Washington law to this alleged tort.

It is not clear whether Washington recognizes a cause of action for prima facie tort where a party allegedly seeks to cause intentional injury by forcing its opponent to hire an attorney. NXIVM has not pointed the Court to any applicable Washington case law, nor has the Court's independent research uncovered any. There are various Washington cases that appear to contemplate this prima facie tort in other contexts. *See, e.g.*, *Lawson v. Boeing Co.*, 792 P.2d 545, 547, n.4 (Wash. Ct. App. 1990); *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989) (en banc) (in the context of tortious interference with contractual relations or business expectancy). However, the Court has been unable to locate any Washington authority for the proposition that a defendant may be liable to a plaintiff for wrongfully forcing the plaintiff to hire an attorney.

Second, even assuming that New York law applies (or that Washington in fact recognizes such a cause of action), NXIVM has not proven that Defendants have acted with "disinterested malevolence" and intentionally sought to injure NXIVM by forcing the company to hire an attorney. Indeed, NXIVM was unable to prove that it has actually been harmed in this case, largely because it decided at the last minute to withdraw its damages claims.

Finally, NXIVM did not plead a cause of action for prima facie tort in the Complaint. It merely seeks to introduce it at the last minute to recover its attorney fees. NXIVM's attempt conflates claims and remedies and is untimely. To the extent NXIVM seeks to amend the Complaint to add a cause of action for prima facie tort, such relief is DENIED.

### V. Conclusion

While the Court is less than entirely sympathetic with Dones under the circumstances, NXIVM's claims and litigation tactics were disproportionate and largely lacking in merit. It is true that Dones released an excerpt of the 2009 Video after agreeing to keep it confidential. She also corresponded with other parties adverse to NXIVM about ways to injure the company. On the other hand, apart from disseminating an excerpt of the 2009 Video, there is no evidence that she committed any overt acts to harm NXIVM, or that NXIVM was in fact injured. She did nothing to deny herself a Chapter 7 discharge. Taken as a whole, a permanent injunction forbidding her from circulating the 2009 Video is proportionate to the risk of harm to NXIVM.

NXIVM's pursuit of Woolhouse is another matter entirely and sheds light on its true motivations. Apart from participating in the April 2009 meeting with Raniere and joining in the subsequent email with the other participants, there is absolutely no evidence that she did anything to harm NXIVM. Her "sin" was to attempt to walk away after discovering that NXIVM was not what she thought or hoped. In return, she was labeled a "suppressive," a term that NXIVM applies to former associates who leave the company or whom NXIVM perceives to be its enemies, and subjected to protracted litigation from two large law firms and a phalanx of attorneys. Despite multiple depositions and extensive discovery, they were never able to prove that Woolhouse did anything wrong. NXIVM's treatment of Woolhouse in this adversary proceeding was, in a word, deplorable.

A separate Judgment will be entered forthwith. The Clerk of Court is directed to file a copy of this Memorandum Decision in Adversary Proceedings 10-04338-BDL and 10-04339-BDL.

// End of Opinion //